# IN THE COURT OF APPEALS OF IOWA

No. 20-1182
Filed November 30, 2020

**IN THE INTEREST OF A.D. and A.G.,**
**Minor Children,**

**A.D. and A.G., Minor Children,**
        Appellants,

**B.D., Mother,**
        Appellant.
_____

Appeal from the Iowa District Court for Polk County, Lynn Poschner, District Associate Judge.

The mother and the minor children appeal the termination of the mother's parental rights. **AFFIRMED ON BOTH APPEALS.**

Alexandra M. Nelissen of Advocate Law, PLCC, Clive, for appellant mother.

Sarah E. Dewein of Cunningham & Kelso, P.L.L.C., Urbandale, attorney for appellants minor children.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Erin Mayfield of Youth Law Center, Des Moines, guardian ad litem for minor children.

Considered by Doyle, P.J., Schumacher, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2020).

**POTTERFIELD, Senior Judge.**

The juvenile court terminated the mother's parental rights to twelve-year-old A.D. and ten-year-old A.G. pursuant to Iowa Code section 232.116(1)(f) (2020). Both the mother and the children challenge the termination on appeal.[1] The children, through their attorney,[2] and the mother argue the children could have been returned to the mother's care at the final day of the termination hearing and the termination petition should have been dismissed. In the alternative, the children and mother argue that a guardianship should have been established in lieu of terminating the mother's rights because termination is not in the children's best interests and permissive factors weigh against termination.

**I. Standard of Review.**

"We review termination proceedings de novo." *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). "The primary interest in termination proceedings is the best interests of the child[ren]." *Id.*

**II. Discussion.**

The juvenile court terminated the mother's rights under Iowa Code section 232.116(1)(f), which allows the court to end the parent-child relationship when:

---

[1] The parental rights of the children's fathers were also terminated; no father appeals.

[2] The roles of the childen's attorney and guardian ad litem were bifurcated. *See* Iowa Code § 232.89(4). Their guardian ad litem does not participate in the appeal. No party objects to the participation of the children in the appeal on their own behalf. *See* Iowa R. Civ. P. 1.210; *In re H.N.B.*, 619 N.W.2d 340, 343 n.3 (noting we do not automatically apply the rules of civil procedure to juvenile proceedings). We note that panels of our court have previously considered the appeals of children in termination actions. *See In re D.S.*, No. 17-1390, 2017 WL 6034636, at *1 (Iowa Ct. App. Dec. 6, 2017); *In re G.S.*, No. 13-0884, 2013 WL 4774040, at *4 (Iowa Ct. App. Sept. 5, 2013); *In re T.P.*, 757 N.W.2d 267, 268 (Iowa Ct. App. 2008).

.

(1) The child is four years of age or older.
(2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
(3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
(4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

Only the fourth element is in dispute—whether A.D. and A.G. could be returned to the mother's care on the final day of the termination hearing in July 2020. *See In re Z.P.*, 948 N.W.2d 518, 523 (Iowa 2020) (considering whether parent was "prepared to assume a parenting role at the time of trial"); *see also In re H.V.*, No. 20-0934, 2020 WL 6157826, at *6 (Iowa Ct. App. Oct. 21, 2020) (considering whether child could be returned to parent "on the day of the final hearing," where the termination hearing spanned three days over three months).

The juvenile court concluded the children could not return to the mother's care because the mother failed to "demonstrate[] abstinence or sobriety from her long time use of methamphetamine and alcohol." The mother and children challenge this finding. They argue there were no behavioral indicators to suggest the mother was still abusing methamphetamine and argue her failure to drug test for months on end does not mean she was still using methamphetamine.

The mother and her children[3] came to the attention of the Iowa Department of Human Services (DHS) after the children found the mother passed out in the

---

[3] The mother has four children; the two oldest children are not at issue in this appeal. They were in the care of the mother at the beginning of this case and were subject to the juvenile court's involvement. But the child-in-need-of-assistance (CINA) cases on the oldest two children were closed in early 2020 after a bridge order transferred jurisdiction of their case to the district court. *See* Iowa Code

family's bathroom covered in feces and vomit. The children called 911, and the mother was taken to the hospital by ambulance. The mother reported she passed out from heavy drinking at a birthday party. At the hospital, she tested positive for amphetamines. The children remained in the mother's care at first, but they were removed and adjudicated CINA a short time later—in December 2018—based on the mother's failure to cooperate with DHS and drug test when asked. Although the mother initially reported she "seldom drinks" and denied using illegal substances, in a later substance-abuse evaluation—in February 2019—the mother admitted drinking "1/3 of a fifth of Fireball" the day before the evaluation and that amount every day or every other day. She also reported using about two grams of methamphetamine the day before and said she smoked methamphetamine almost daily for the previous thirty days.[4] Based on her updated statements, the mother was diagnosed with severe stimulant (methamphetamine) use disorder and severe alcohol use disorder.

After a few false starts, the mother entered inpatient substance-abuse treatment on May 30, 2019, and remained there until she was "abrupt[ly]" discharged on September 17, 2019. The mother's time in the program was not without issue; she tested positive for methamphetamine at entry and again on July 4. She maintained her July 4 positive was from using someone else's vape pen, which she was unaware contained methamphetamine. The mother's discharge

---

§ 232.103A. According to testimony at the termination hearing, the district court entered a custody decree giving the father physical care of the oldest two children. The mother maintained joint legal custody of the oldest two children and was allowed to have unsupervised visits with them.

[4] In another, later evaluation, the mother reported she smoked methamphetamine daily for the last year and a half.

.

occurred after the mother was put on a "behavioral support management" plan in August because she was "struggling with healthy responses to peers and staff, and instant gratification." Rather than following the plan, the mother went AWOL from the facility two separate times in September. One of those two times, she went to an urgent care clinic and was given IV drugs; her substance-abuse counselor characterized this as drug-seeking behavior. In the written discharge statement, the mother's counselor stated:

> While she did make significant progress, [the mother] continued to demonstrate behaviors that were not aligned with a healthy recovery program. For example, seeking instant gratification, impulsivity, dishonesty, and failed to take accountability. As such, the decision was made to continue working with [her] on an outpatient level of care. [The mother] failed to re-engage in services. She has an active DHS case and was having semi-supervised visits and also engaging in mental health services prior to discharge. This counselor is recommending [she] re-engage in substance abuse treatment, mental health therapy, continue taking medications prescribed, and secure a sober support system.

Following her discharge, the mother completed a four-week outpatient substance-abuse treatment program in November 2019.

The mother was asked to put on a sweat patch for drug testing on November 1. But the mother, who was then living in a shelter, refused to do so, claiming she was concerned she may test positive due to exposure to the other people living in the shelter. The mother then failed to or refused to provide drug screens on December 19 and 23, January 21, February 13, April 17 and 28, and June 4. Additionally, her treatment facility called the mother's "color code" twice in June, but the mother failed to show up for testing on both dates. She was also asked to complete a drug test on June 18 while all parties were present on a call with the court for the scheduled termination hearing—it was ultimately continued

.

for personal reasons for one of the attorneys—and she failed to comply with that test as well. The mother completed only one drug test in 2020—in February—and it was negative for all substances. However, that test was completed at the end of a scheduled meeting with her substance-abuse counselor and therefore was not random.

The mother maintained the results from sweat patches were unreliable and stated that was the reason she would not wear one, but when it was then ordered for her to test both through urinalysis and sweat patches, the mother still failed to attend the random drug tests. In our cases, we have repeatedly presumed missed drug tests are "dirty." *See, e.g.*, *In re E.H.*, No. 20-0974, 2020 WL 6157841, at *1 (Iowa Ct. App. Oct. 21, 2020); *In re D.G.*, No. 20-0587, 2020 WL 4499773, at *4 (Iowa Ct. App. Aug. 5, 2020) (presuming the tests the father missed—other than the ones due to his work schedule—would have resulted in positive tests); *In re L.B.*, No. 17-1439, 2017 WL 6027747, at *2 (Iowa Ct. App. Nov. 22, 2017); *In re C.W.*, No. 14-1501, 2014 WL 5865351, at *2 (Iowa Ct. App. Nov. 13, 2014) ("She has missed several drug screens, which are thus presumed 'dirty,' i.e., they would have been positive for illegal substances."). And the mother never established long periods of sobriety. By her own admission, she used methamphetamine daily for approximately a year and a half before the case started. She then tested positive for or admitted using amphetamines, methamphetamine, or both in October 2018 and then February, April, May, and July 2019. The mother was discharged from her inpatient treatment program in September after she went AWOL and exhibited drug-seeking behavior while absent from the treatment facility. Between December 2019 and the final day of the termination hearing in

July 2020, the mother skipped all but one drug test. At the termination hearing, the mother was asked when she last used methamphetamine, she responded, "Before I went into [inpatient treatment]. . . . When was it, March? End of February, beginning of March [2019]." The mother entered inpatient treatment on May 30, 2019; she tested positive for methamphetamine in April, May, and July 2019.

Because she never established a lengthy period of sobriety and because DHS and the court took steps to address the mother's concern regarding false positives for sweat patches and then she still missed all subsequent drug tests, we think it is fair to assume the mother's missed tests would have been positive for methamphetamine. *See, e.g.*, *In re I.J.*, No. 20-0036, 2020 WL 1550702, at *2 (Iowa Ct. App. Apr. 1, 2020) ("We presume these missed drug tests would have resulted in positive tests."). And "[a] parent's methamphetamine use, in itself, creates a dangerous environment for children." *In re J.P.*, No. 19-1633, 2020 WL 110425, at *2 (Iowa Ct. App. Jan. 9, 2020) (citing *In re J.S.*, 846 N.W.2d 36, 37 (Iowa 2014)). We agree with the juvenile court that the children could not be returned to the mother's care in July 2020.[5]

In the alternative, the mother and the children argue the court should have established a guardianship in the maternal cousin in lieu of terminating the

---

[5] The mother also argues that A.D. and A.G. can be returned to her care because she was allowed to keep joint legal custody of her oldest children and is allowed to spend time with them unsupervised. We are not aware what evidence was presented to the district court—if any—before the custody order regarding the oldest two children was entered. Additionally, it is a false equivalence to say that because the mother is safe enough to spend time with her now sixteen- and fifteen-year-old children unsupervised, she can provide the necessary care and safely parent two younger children full-time.

.

mother's parental rights. *See* Iowa Code §§ 232.104(2)(d)(1) (allowing the court, after a permanency hearing, to enter an order transferring guardianship and custody of the children to a suitable person), 232.117(5) (allowing the court, after a termination hearing, to not order termination of parental rights but instead enter an order in accordance with several sections, including section 232.104). To establish the guardianship, the court must determine by clear and convincing evidence that "termination of the parent-child relationship would not be in the best interest of the child[ren]." *Id.* § 232.104(4)(a). The mother and children assert a guardianship is the right way for the court to establish permanency in this case because termination is not in the children's best interests and permissive factors weigh against termination. *See* Iowa Code § 232.116(2) (best interests), (3)(a) (permissive factor when relative has legal custody), (3)(b) (permissive factor when child *is over ten years of age* and objects to the termination) (emphasis added).

Our case law does not favor guardianships in lieu of termination. *See In re A.S.,* 906 N.W.2d 467, 477 (Iowa 2018) ("[A] guardianship is not a legally preferable alternative to termination."); *In re T.M.*, No. 20-1163, 2020 WL 6482346, at *3 (Iowa Ct. App. Nov. 4, 2020) (affirming termination instead of a guardianship because "[g]uardianships can be challenged and dissolved" and "we find it better to opt for permanency and stability"). Still, we recognize that the children at issue here have objected to the termination of their mother's parental rights; they remain steadfast in their desire to have her in their lives going forward.[6] But their wish is

---

[6] We note that A.D.'s and A.G.'s wishes appear to have been given equal weight by the parties and the juvenile court. But section 232.116(3)(b) provides that the court need not terminate when a child "is *over ten years* of age*"* and objects. *Compare* Iowa Code §§ 232.116(3)(b) (including "child[ren] over ten years of age")

.

not controlling. *See In re A.R.*, 932 N.W.2d 588, 592 (Iowa Ct. App. 2019) ("While we credit these teenagers for clearly expressing their objection to the termination, we do not believe this permissive factor required the juvenile court to bypass termination in this situation."). Rather, it is one of the things we consider when determining what is in these children's best interests going forward. *See In re A.S.*, No. 16-1984, 2017 WL 710562, at *3 (Iowa Ct. App. Feb. 22, 2017) (affirming termination over children's objection because "[o]ur overriding concern must be the long-term best interests of the children").

The juvenile court gave the option of establishing a guardianship extensive consideration in its ruling, stating:

> [A.G.] and [A.D.] want to return to their mother. They have wanted to return to their mother since they were removed. Their stance is important to the question of best interest and important to [the court]. However, it is questionable whether they understand how problematic [the mother's] substance use is given that they have wanted to return to her custody even when she was very obviously actively using methamphetamine. [The children] want what everyone wanted—for [the mother] to be able to provide them with consistently safe parenting. However, their judgment as to what is truly best for them is clouded by their love for [the mother] and lack of understanding of the dangerousness of her addiction.
>
> The [maternal cousin and her family] are willing to provide a permanent home and care for the children. They are willing to maintain the children's relationships with their siblings. They are also willing to maintain contact with [the mother] provided that the interactions are safe and healthy for the children. The [placement's] communication with [the mother] has been hindered by [the mother's] hostile behavior, not the [placement's] willingness. The [maternal cousin's family] ha[s] expressed doubt that [the mother] will abide by the boundaries of a guardianship or that [she] will not continue to lead the children to believe that they will be returning to her, causing them confusion and distress. Their doubt is for good reason based on [the mother's] past behavior.

---

*with* 232.116(1)(f)(1) (including children "four years of age or older"). Only A.D. is over ten.

.

> For the [court], the question is not whether the children should or could return to [the mother]—for all of the reasons discussed above, they cannot—the question is whether the children will thrive best under a guardianship or under a termination and adoption. The court has the authority to establish permanency through a guardianship. . . .
>
> Guardianship would mean that the children and the [maternal cousin's family] would continue under court oversight for six years for [A.D.] and eight years for [A.G.]. The children have been under the supervision of the court for almost two years. Those two years have been marked by contentious court proceedings, [the mother's] tumultuous ups and downs with her recovery and mental health, hostility from [the mother] directed toward the [maternal cousin], two disrupted placements resulting from the [maternal cousin] becoming too overwhelmed to continue to have temporary custody of the children. With this history, it is hard to see how continued involvement in court would be healthy or provide stability for the children. In fact, the [court] is concerned that continued court involvement will only provide opportunities for [the mother] to continue to attack the [maternal cousin] and could jeopardize the children's placement there. Disruption of the children's placement would be devastating. There are no other options for placement aside from foster care, and foster care was not successful for these children before.

While the mother wants a guardianship to be established to stave off termination, she has shown a lack of support for the children's current caretakers. *Cf. In re B.T.*, 894 N.W.2d 29, 34 (Iowa Ct. App. 2017) (affirming guardianship in lieu of termination where the mother and guardian grandmother had "a close, mature, and healthy relationship that is free of conflict" and there was "evidence the mother and the grandmother c[ould] work together in the best interests of the child"). There have been reports throughout the case—both early on when the mother was clearly actively using methamphetamine and later, after she completed substance-abuse treatment and became more involved with mental-health counseling—of the mother telling these children they will be soon returning to her care. At times, she has undermined the maternal cousin and her husband by telling the children they

.

did not have to listen to them. And the maternal cousin questioned whether the mother would respect the boundaries they set.

We understand the children's wish for a guardianship. But based on the circumstances of this case, we believe that the less-severe option would leave the children vulnerable to the mother's claims that she is their parent, she is the one to be listened to, and she is the one with whom they will be living soon. Allowing the children to be involved in such back and forth is not in their best interests. Termination of the mother's parental rights to A.D. and A.G. will provide these children with certainty about their future, and adoption can provide them the stability they deserve. *See A.S.*, 906 N.W.2d at 478.

We affirm the termination of the mother's parental rights to A.D. and A.G.

**AFFIRMED ON BOTH APPEALS.**

.